PEOPLE OF STATE OF ILLINOIS ex rel. HUNT, Atty. Gen., v. ILLINOIS CENT. R. CO. et al.

(Circuit Court of Appeals, Seventh Circuit. February 11, 1899.)

No. 376.

1. APPEAL—EFFECT OF DECISION—PROCEEDINGS ON MANDATE.
      Where a mandate from the supreme court reserves but a single question of fact for the further determination of the trial court, all other questions involved in the case are res judicata between the parties, and not open to further consideration by the trial court nor on a review of its decision.

2. NAVIGABLE WATERS—RIPARIAN RIGHTS—CONSTRUCTION OF JUDGMENT.
      A decision of the supreme court adjudged that a riparian owner on Lake Michigan had the right to maintain piers extending into the lake "to the point of practical navigability," and its mandate directed the trial court to determine whether piers previously built extended beyond such point, "having reference to the manner in which commerce in vessels is conducted on the lake." Held, that the judgment of the supreme court must be construed to mean that the property owner had the right at all

times to maintain piers to such point as was necessary at that time to render them practically useful by reaching water of sufficient depth to float the vessels then in common use in conducting the commerce of the lake, the line of practical navigability being a shifting line; hence the inquiry of the court under the mandate should be as to the line of practical navigability at the time the inquiry was made, and not as to its position at the time of the commencement of the suit.

Woods, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

The information in this suit was filed by the attorney general of the state of Illinois on March 1, 1883, to determine the rights respectively of the state of Illinois, of the city of Chicago, and of the Illinois Central Railroad Company in land submerged or reclaimed in front of the water line of the city on Lake Michigan. On September 24, 1888, a final decree was entered in the circuit court in conformity with the opinion of Mr. Justice Harlan, 33 Fed. 730. The cause was appealed to the supreme court of the United States, and was determined by that court December 5, 1892 (146 U. S. 387, 13 Sup. Ct. 110), where the facts of the case are fully stated. The court, after declaring the relative and respective rights of the parties, proceeds to say: "But the decree below, as it respects the pier commenced in 1872 and the piers completed in 1880 and 1881, marked 1, 2, and 3, near Chicago river, and the pier and docks between and in front of Twelfth and Sixteenth streets, is modified so as to direct the court below to order such investigation to be made as may enable it to determine whether those piers erected by the company by virtue of its riparian proprietorship of lots formerly constituting part of section ten extend into the lake beyond the point of practical navigability, having reference to the manner in which commerce in vessels is conducted on the lake; and, if it be determined upon such investigation that such piers, or any of them, do not extend beyond such point, then that the title and possession of the railroad company to such piers shall be affirmed by the court; but if it be ascertained and determined that such piers, or any of them, do extend beyond such navigable point, then the said court shall direct the said pier or piers, to the excess ascertained, to be abated and removed, or that other proceedings relating thereto be taken on the application of the state as may be authorized by law; and also to order that similar proceedings be taken to ascertain and determine whether or not the pier and dock, constructed by the railroad company in front of the shore between Twelfth and Sixteenth streets, extend beyond the point of navigability, and to affirm the title and possession of the company if they do not extend beyond such point, and, if they do extend beyond such point, to order the abatement and removal of the excess, or that other proceedings relating thereto be taken on application of the state as may be authorized by law." The mandate of the supreme court was filed in the court below on the 12th day of April, 1893, and directed such execution and further proceedings to be had in conformity with the opinion and decree of the supreme court. Thereupon, on October 27, 1893, the cause was referred to a master to take testimony, and report the same. In pursuance of that order, a mass of testimony was taken by the master, bearing directly or remotely upon the question reserved by the supreme court for the determination of the circuit court, and was reported to the latter court, which court, on the 26th day of May, 1896, decreed "that the piers and docks referred to in the aforesaid judgment and mandate of the supreme court, and there described as piers marked 1, 2, and 3, near Chicago river, and the piers and docks constructed by said railroad company in front of the shore between Twelfth and Sixteenth streets, all in the city of Chicago, in the state of Illinois, do not extend, nor does either of them extend, into the lake beyond the point of practical navigability, having reference to the manner in which commerce in vessels is conducted on the lake." It was further decreed that the title and possession of the Illinois Central Railroad Company to the said piers, and each of them, and every part thereof, was affirmed. From this decree an appeal by the people of the state of Illinois is brought to this court.

John H. Hamline, for appellant.

John N. Jewett and Benjamin F. Ayer, for appellees.

Before WOODS and JENKINS, Circuit Judges, and GROSSCUP, District Judge.

JENKINS, Circuit Judge (after stating the facts). An elaborate and learned discussion by counsel is presented to the court upon the question of riparian rights, and upon the argument great stress was laid upon the decision of the supreme court in Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, rendered since its decision declared by that court in this case. And since the argument we are referred to the decision of the supreme court of Illinois in Revell v. People (filed Dec. 6, 1898) 52 N. E. 1052, as yet unreported officially, which, it is said, determines that the rights of the riparian owner in the submerged lands of Lake Michigan do not extend beyond low-water mark. We are, however, not permitted to enter into the field of discussion of this most interesting question, because, as we think, our duty is limited by the mandate of the supreme court to the consideration of the single question of fact whether the structures in question "extend into the lake beyond the point of practical navigability, having reference to the manner in which commerce in vessels is conducted on the lake." Nothing is open to consideration except the specific subject of inquiry reserved by the mandate of the ultimate tribunal. All else is final and conclusive between the parties. In re Sanford Fork & Tool Co., 160 U. S. 247, 16 Sup. Ct. 291. So that the question before us is purely one of fact. The supreme court has determined that to a certain extent the appellee had the right to construct the piers in question; that it had the right to penetrate the waters of the lake with these piers to the "point of practical navigability, having reference to the manner in which commerce in vessels is conducted on the lake." It is said by counsel that such inquiry should be limited to the date of the filing of the information in this suit, to wit, March 1, 1883, and that we have no right to consider any changes in the situation occurring since that date which may have enlarged the right. In this contention we cannot concur. The language of the mandate does not so speak. It is couched in the present tense, speaking to the date of the decree, and in our judgment rightly so speaking. Equity is not arbitrarily bound to decree rights as they existed at the date of bringing the suit. It considers the nature of the right, the situation of the parties at the date of the decree, and what is at that time equitable to be done. It recognizes changes in the situation of the parties and their rights since the filing of the bill. So that, in the case before us, if there have been changes in those things which should control our judgment, which materially affect the situation, it is fitting that a court of equity should regard such changed conditions and conform its decree thereto. We take it that the riparian right to penetrate the waters of the lake to the point of navigability which is recognized by the decision of the supreme court in this case is not a right that is concluded and exhausted by the single exercise of it, but that the owner has a right at all times to reach the point of practical navigability as it may exist from

time to time. The pier that sufficed when the Great Lakes were navigated by vessels not exceeding 150 tons burden would of course be wholly insufficient to meet the demands of commerce at this time, when the waters of the lake are plowed by vessels of 4,000 tons burden and over. The right is a relative right, having relation, in the language of the supreme court in this cause, "to the manner in which commerce in vessels is conducted on the lake." To serve any useful purpose these piers must reach water of sufficient depth to float vessels when laden, and alongside of which vessels can be brought to be conveniently loaded or unloaded. A sufficient depth of water to float vessels such as navigate the waters of the lake is essential, and it is a necessary incident of the riparian right that the pier shall penetrate the water to a distance from the shore necessary to reach water which shall float vessels, the largest as well as the smallest, that are engaged in the commerce of the lakes. Atlee v. Packet Co. 21 Wall. 393; Langdon v. Mayor, etc., 93 N. Y. 151. We think that no better statement of the right can be found than that declared by the supreme court of Wisconsin, speaking by the distinguished Chief Justice Ryan, in Boom Co. v. Reilly, 46 Wis. 244, 49 N. W. 979, and accepted as correct in Gould, Waters, § 181:

"It is claimed by the learned counsel that the measure of riparian right is restricted to water not navigable, and is unavailing because it cannot reach the point where it would become useful. It is not believed that the language of the federal supreme court in Dutton v. Strong, 1 Black, 23, or Atlee v. Packet Co., 21 Wall. 389, or of this court in Diedrich v. Railway Co., 42 Wis. 248, or on the former appeal in this case, is properly subject to such hypercriticism. The right sustained in all these cases is a practical right 'in aid of navigation, through the water far enough to reach actually navigable water' (Diedrich v. Railway Co.); 'to aid in floating logs' (Boom Co. v. Reilly, 44 Wis. 295). These terms do not imply—the whole tenor of the opinion repels—the construction that wharves, piers, booms, and the like, in aid of navigation, must be constructed within such limits as to make them inoperative. A pier upon Lake Michigan, to aid navigation, must go into water deep enough to be accessible to vessels navigating the lake. A boom on a logging stream, to aid such navigation, must go into water deep enough to be accessible to floating logs; must be so constructed as to receive and discharge floating logs. In either case, to reach navigable water reasonably implies reaching it with effect to accomplish the purpose; the word often signifying some penetration of the thing reached. One is not understood to stop outside the limits of a place when he is said to reach it. He is understood to enter it as far as may be necessary for his purpose. The right in question necessarily implies some intrusion into navigable water, at peril of obstructing navigation. Atlee v. Packet Co. This intrusion is expressly permitted to aid navigation, and expressly prohibited to obstruct navigation. It is impossible to give a general rule limiting its extent. That will always depend upon the conditions under which the right is exercised; the extent and uses of the navigable water; the nature and object of the structure itself. A structure in aid of navigation which would be a reasonable intrusion into the waters of Lake Michigan would probably be an obstruction of navigation in any navigable river within the state. A logging boom which would be a reasonable intrusion into the waters of the Mississippi would probably be an obstruction of navigation in most or all of the logging streams within the state. The width of a river may justify a liberal exercise of the right of intrusion, or may exclude it altogether. Its extent is purely a relative question."

We think it must be, as stated by Chief Justice Ryan, that the extent of this riparian right is purely a relative question, and is limited only

to the line of navigability upon a particular stream or body of water. That line of navigability is a shifting line; it is one thing to-day, and quite another thing to-morrow. The pier that would have met the conditions of commerce on the lakes 50 years ago would be wholly inadequate at the present time; and we think it would be the merest mockery to say that, because the riparian owner had, 50 years ago, exercised his right of riparian proprietorship, and constructed a pier which intruded into the waters of the lake sufficiently to meet the demands of commerce at that date, he is forever concluded from further intrusion into the waters of the lake to reach to the present line of navigable waters, and to accommodate his structure to the changed condition of things. We must have regard to the object for which this right is conferred. It is to reach out to accommodate the vessels that plow the waters of the lake. It is in aid of the commerce of the lake, and that right, for that purpose, should be liberally interpreted and upheld.

We come, therefore, to the question of fact reserved by the supreme court—whether these piers intrude into the lake beyond the point of "practical navigability, having reference to the manner in which commerce in vessels is conducted on the lake." We do not deem it needful to enter into the details of the evidence presented, but find it necessary only to refer to some general and salient facts which must control our judgment. In the phenomenal growth of the Northwest within the past 50 years the commerce of the Great Lakes has not been at a standstill. Its growth and development has been commensurate with the development of the territory; and, notwithstanding the wonderful extent of construction of railways, which to a considerable degree has affected the commerce of the lakes, the development of shipbuilding and the extent of the carrying trade upon the lakes excites surprise and admiration. The port of Chicago, which 50 years ago was an inconsiderable point of commerce, has become one of the great shipping ports of the world. The volume of trade flowing through it, both east and west, can hardly be overstated; and naturally we find a constant increase in the tonnage of the lakes to meet the vast problem of transportation. We observe, also, in the solution of that problem, a marked change in the character of the means of transportation. Time and cost have become of the essence of success in transportation. It will no longer answer to depend upon the variable winds, and steam has to a great extent supplanted propulsion by means of sails. In the year 1881, 8,045 domestic sail vessels entered the port of Chicago and 3,466 steam vessels. In 1886, 6,006 domestic sail vessels as against 3,930 steam vessels. In 1894, 2,582 domestic sail vessels as against 4,707 steam vessels. What is true of Chicago is true of the other ports upon the Great Lakes. The mode of transportation is largely changed from sail to steam vessels, and this doubtless to render possible competition between water and rail transportation. It is also true of the lakes, as of the seas, that vessels of iron and steel construction are to a large extent superseding those of wooden construction, and vessels of great tonnage those of small tonnage. The average tonnage of sail vessels on the lake in 1884 was 189 tons as against 238 tons in 1894. The average tonnage of metal steamers in

1884 was 889 tons as against 1,566 tons in 1894, and steamers of over 4,000 tons burden now navigate the lakes. All this is essential that freight may be transported at the highest rate of speed and at the minimum of cost. These large vessels of course require a greater depth of water than was demanded by the sail vessel of 50 years ago. Prior to the year 1894, 15 feet was the limit of draft of vessels passing through the St. Clair Flats, 14½ feet was the limit of vessels passing into Lake Superior, while 16 feet was, and is now, the limit in the Chicago river. The government of the United States, in its efforts to promote the commerce of the lakes, has recognized these changed and changing conditions in the carrying trade, and has sought by liberal efforts to protect and encourage it. The depth of the water in St. Clair Flats flowing through the artificial channel constructed by the government was at first but 9 feet. That depth was increased by the government to 12, then to 16, and now to 20 feet. Between the years 1882 and 1885 the government appropriated over seven million of dollars for the improvement of the Sault Ste. Marie river in the interest of commerce passing from Lake Superior to the lower lakes. Since 1881 vessels drawing more than $14^7/_{10}$ feet of water could not pass the locks until the government recently made a 20-foot channel. In the year 1892, the congress appropriated $375,000 for a "ship canal 20 and 21 feet in depth and a minimum width of 300 feet in the shallows of the waters of the Great Lakes between Chicago, Duluth, and Buffalo," and provided that the secretary of war might contract to carry out the plans proposed by Gen. Rowe, of the corps of engineers, United States army, under date of January 20, 1891, for such ship canal, at a cost not to exceed $2,965,000, exclusive of the amount then appropriated. 27 Stat. 108, c. 158. It also appears in evidence that the harbors of Buffalo and Duluth, which at present are but 18 feet in depth, are being deepened to 20 feet; and we are informed by the testimony of Maj. Marshall, of the corps of engineers, U. S. army, that the outer harbor of Chicago cannot be used for commercial purposes, and is unavailable as a harbor of refuge. So it is manifest that, to accommodate the larger steamers engaged in the commerce of the lakes, and which have a draft of 17 or 18 feet of water, a depth of 20 feet of water is necessary at piers and docks, and that this necessity is attested by the action of the government, which is expending vast sums to that end in the improvement of the waterways connecting the Great Lakes, and is fortified by the concurrent testimony of the officers of the engineer corps of the army, who have to do with these improvements.

There is another circumstance which is not without weight. On September 22, 1890, the secretary of war approved the recommendation of Maj. Adams, of the corps of engineers, in charge of the matter, that the harbor line beyond which no wharves or other structures should be built, should be adopted as follows: "Commencing at a point on the south side of the United States south pier of the entrance to Chicago river and twelve hundred feet west of the west line of the easterly breakwater, outer basin, and running due south till it intersects the prolongation of the north line of Randolph street, thence due west eight hundred feet, thence due south to the southern limit of the outer

harbor." On the 24th of July, 1895, the secretary of war granted a permit reciting that the city of Chicago had applied for permission to fill in, for the purpose of a public park established by an ordinance of the city council of that city passed June 27, 1895, a portion of the outer harbor at Chicago as far out as the harbor line established by the secretary of war September 22, 1890. The secretary granted permission accordingly to fill in to the outer harbor line so established upon the following condition, among others: that there should be constructed along the dock line, and entirely inclosing the area to be filled, before any deposit whatever should be made, a substantial and tight bulkhead or retaining wall extending not less than 6 feet above extreme low-water mark in Lake Michigan, and so constructed that it should allow dredging to the depth of 20 feet against it, and of sufficient mass to act as retaining wall against a back-filling reaching to its top. On the 21st of October, 1895, the common council of the city of Chicago passed an ordinance which was approved on the 23d day of October, 1895, reciting the original decree in this cause in the court below, the decision of the supreme court thereon, and the permission obtained from the secretary of war; and ordained that for the purpose of providing suitable public landing places for steam vessels and other craft employed in navigation on Lake Michigan the public grounds of the city of Chicago known as "Lake Park," lying east of Michigan avenue, and between the south line of Randolph street and the north line of Lake Park place, formerly known as "Park Row," should be extended east of the tracks and grounds of the Illinois Central Railroad Company by inclosing and filling all that place in the shallow waters of Lake Michigan within the outer harbor, so called, included within the lines specified, which were the harbor lines adopted by the secretary of war. We need not stop to state in detail the general provisions of this ordinance, except to say that, in consideration of certain rights granted, or supposed to be granted, to the Illinois Central Railroad Company, many duties were imposed upon that company with respect to filling and the construction of abutments and other works upon the proposed Lake Park, and that the work so authorized has been and is being by the city and the Illinois Central Railroad Company diligently prosecuted. It is enough to say that the harbor line so adopted by the United States government at the request of the city of Chicago is on a line with the outer line of the pier at Thirteenth street extended, now complained of, and extends north to the piers at the north of Randolph street extended. Without undertaking to say to what extent these proceedings of the city of Chicago were authorized as between it and the people of the state of Illinois, it is sufficient to say that these things have been done without any adverse action on the part of the state of Illinois. If they have no other effect, they tend to strengthen, if support be needed, the general drift of all the evidence in the case that the necessities of the commercial marine of the Great Lakes require substantially a depth of water of 20 feet to float the larger class of vessels, and indicate that that depth at the present time marks "the point of practical navigability, having reference to the manner in which commerce in vessels is conducted on the lake." It is conceded that the piers in question do not intrude into

91 F.—61

the waters of the lake to that extent, and that that depth of water can be obtained at them only by dredging. Conceding, then, as we must, the right of the railroad company to reach that point of practical navigability, these structures were not and are not unlawful, and its rights to them must be sustained. The title to submerged lands resting in the state is held in trust in aid of navigation. Courts have at all times been diligent to protect and enforce rights of navigation in aiding and protecting whatever may tend to build up and encourage commerce upon the seas. It does not comport with our sense of duty in the protection of a mere naked legal title to submerged land to deny a conceded riparian right—conceded because so declared by the ultimate tribunal—when that bare legal title is held in trust for the very purpose to which these structures are devoted, namely, the accommodation of the commerce of the lake. To compel the abatement or removal of these structures to the extent demanded, or to any extent, in view of the establishment of the harbor line as indicated, would be to render them useless for the accommodation of the commerce of the lakes, and to practically deny to the appellee a substantial and valuable riparian right to which the supreme court has determined it is entitled.

WOODS, Circuit Judge (dissenting). I agree that our duty is simply to determine whether the decree below is in accord with the mandate of the supreme court, and that mandate, speaking as it does in the present tense, I also agree, must be deemed to refer to the date of the opinion (December 5, 1892) in pursuance of which it was issued; but it does not seem to me to follow that no consideration may be given to the later cases of Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, and Revell v. People, 52 N. E. 1052, to which reference has been made. These cases, I think, put it beyond doubt that, if the question were yet open, the supreme court would not hold, as it did, that the Illinois Central Railroad Company had any right by virtue of its ownership of riparian lands to build piers into the lake to the point of navigability. We are therefore dealing with a nakedly technical right, which exists only because it has been adjudged to exist. But for the judgment on which it rests, it has not even the merit of the celebrated stipulation for a pound of flesh. The mandate for its allowance having passed, and not having been recalled or modified, must be enforced to the full extent of its necessary scope, but its scope should be determined by a strict construction, rather than by the liberal rule enlarged upon in the opinion of the majority. It may be that the riparian right ordinarily is not concluded or exhausted by a single exercise of it, and that "the owner has the right at all times to reach the point of practical navigability as it may exist from time to time"; but the supreme court has not said that of this case, and we need not, and, as I think, should not, say it. On the contrary, the opinion of the supreme court and its mandate are too specific in one respect to admit of the liberal construction which the court favors. "To the point" of practical navigability is the specific limitation, and "the excess beyond such point" is to be removed or abated. These are expressions which make irrelevant any argument or citation of au-

thority to show that "to reach" sometimes means "to penetrate," or that to "reach navigable water" reasonably implies some "intrusion into it." Equally irrelevant seems to me the suggestion that a pier would be of no use without navigable water alongside of it. If not outside of the inquiry commanded, the proposition would be unavailing for the purpose of the argument, because the necessary depth at the sides of a pier extending "to the point" of navigability is only a matter of dredging, from the cost of which the railroad company should not be relieved at the expense of the state. The mandate seems to me to leave room for differences of opinion only in respect to the meaning of the expression "practical navigability, having reference to the manner in which commerce in vessels is [was then] conducted on the lake." The question, I agree, is one of fact, but it is to be determined according to the meaning of that expression. The court below was not only at liberty, it could not escape the duty, to determine the meaning of the words, and if there was doubt, it had the right, and this court now has the right, to favor, and, as it seems to me, in view of the later opinion of the supreme court and the ruling of the highest court of the state, ought to favor the public title, which is just and clear, rather than the private claim, which is technical, and should not be enlarged by implication, either of law or fact. The evidence, as I recall it, shows that the piers for the greater part, if not for their entire length, were erected in water varying in depth from 8 to 13 feet; and for many boats on the lake that is, and always has been, navigable water. The very interesting facts and figures in relation to the growth of commerce, and the increased size and draft of boats brought into use, is of little significance, unless the mandate is to be interpreted as meaning that the question of navigability is to be determined with reference solely to boats of the greatest, or at least those of more than the average, draft. It is undeniable that there is now, and since Chicago was founded there has been, in actual use upon the lake, a large, though in recent years diminishing, number of vessels drawing 9 feet or less, and I should be unable to agree that these piers do not extend beyond the point of navigability, within the meaning of the mandate, even if the riparian right involved were one of the highest equity. The title to the land under the piers certainly was once in the state, and never by accretion of soil or recession of the waters has there been an appreciable shifting of the boundary line between the land and the water. Neither had there been, before the building of the piers, any change in the depth of water of a character to affect the question of navigability where the piers stand, or in the neighborhood; and it would be difficult, I think, by the evidence, or on general information, to specify the time, either by year or by decade, when by change in commerce as conducted in vessels on the lake the title of the state was devested, or became subject to occupation by a riparian owner for the construction of piers, conceding such a right to exist in nonnavigable water. It was certainly not within the power of the Illinois Central, by putting larger boats on the lake than had been in use before, to take from the state what, by the decision of the supreme court in this case, the state had not power, even by an act of its legislature, to grant to that company; and, if the larger boats were brought into use

by·others for whose action the railroad company was in no sense responsible, the conclusion is not affected. The essential fact is that water from 6 to 13 feet deep is navigable to vessels yet engaged in commerce on the lake, and these piers extend far beyond the point where, but for their presence, there would be a depth of 10 feet or more. There have been, and doubtless will be, demands for channels and harbors of increased depth; but that does not mean, theoretically or practically, that waters once sufficient for the largest boats in use have ceased to be navigable, though there are now boats for which they are inadequate. The establishment by the government of a harbor line, and the ordinances and contracts for the construction of Lake Park, have, in respect to this case, just this significance, and necessarily or fairly no more: that, instead of ordering the piers in question to be abated or removed, we should direct, as the mandate permits, that "other proceedings relating thereto be taken on application of the state, as may be authorized by law." The land under the piers—a considerable part of it upon any reasonable view of the case, as I see it—belongs to the state. It should be surrendered or paid for. It is not, as the opinion of the supreme court in this case demonstrates, "a mere naked legal title" which the state has; nor is it held only "for the very purpose to which these structures are devoted, namely, commerce on the lake." This company holds possession for its own private purposes, and to that extent we have an example to the contrary of the belief declared in the opinion of the supreme court, "that no instance exists where the harbor of a great city and its commerce have been allowed to pass into the control of any private corporation." The state, if restored to its rights, would hold for the benefit of the public, and could alienate only "in those instances mentioned of parcels used in the improvement of the interest thus held, or when parcels can be disposed of without detriment to the public interest in the lands and waters remaining." So said the supreme court in this case. We should not say otherwise.

The decree appealed from is affirmed.