## THE TERRITORY OF HAWAII *v.* LILIUOKALANI and JOHN H. WILSON.

APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

SUBMITTED NOVEMBER 1, 1901.          DECIDED MARCH 11, 1902.

GALBRAITH, J., GEO. D. GEAR, CIRCUIT JUDGE, IN PLACE OF FREAR, C.J., DISQUALIFIED, AND THOMAS FITCH, ESQ., OF THE BAR, IN PLACE OF PERRY, J., DISQUALIFIED.

A royal patent issued in 1866 by Kamehameha V to land covered by the mahele of 1848, which describes the seaward boundary line as "running to the sea; thence along the sea at low water mark," conveys the land lying between high and low water mark within such boundary line, the king having power to convey land between high and low water mark.

The resolution of the Privy Council of August 29, 1850, did not have the effect of a law, as the Privy Council had no authority to enact laws.

The words, "koe nae ke kuleana o na kanaka" or, in their English equivalent, "reserving however the people's kuleana therein," as used in conveyances in this Territory, means a reservation of the house lots, taro patches, or gardens of natives lying within the boundaries of the land conveyed.

OPINION OF THE COURT BY CIRCUIT JUDGE GEAR.

This is an appeal by the defendants from a *pro forma* order made by a judge of the First Circuit Court overruling a demurrer to a bill in equity for an injunction.

The bill alleges title of the United States in and to the public lands in Hawaii, and that the right to the possession, use, income and benefit thereof is in the Territory of Hawaii.

The bill then sets out in *haec verba* Royal Patent number 5,588, issued March 23, 1866, by Kamehameha V. and alleges that defendant Liliuokalani claims ownership under said patent.

The patent describes one of the boundaries of the land as following a certain line "running to the sea; thence along the sea at low water mark to commencement."

The defendant Wilson is alleged to be a licensee or lessee of Liliuokalani authorized by her to remove sand and gravel from the land between high and low water mark, and the bill seeks to restrain either and both of the defendants from removing the sand and gravel, on the ground that the land between high and low water mark belongs to the Government and that so much of the royal patent as purports to convey land below high water mark is null and void, for the reason that Kamehameha V had no lawful power or authority at the time of issuing the patent to convey the same.

It will be seen therefore that the only question necessary to be decided is as to whether or not the king had power to grant and convey the land between high and low water mark.

The general rule of law is that the sovereign power of any country or state can make a valid grant to a private individual of land between high and low water mark.

Gould, in his treatise on the law of waters, says: "The state may grant to individuals or corporations the soil of public navigable waters," and cites many cases upholding this proposition. Gould on Waters, Sec. 36. But "an express declaration is necessary to warrant the inference that it was intended to permit the shore below high water mark to be converted into private property." *Idem.* "The United States, while they hold the country as territory having all the power, both national and municipal government, may grant, for appropriate purposes, titles or rights in the soil below high water mark of tide waters." *Idem* Sec. 40; *Shively v. Bowlby,* 152 U. S., 1, 47, 58.

"Individuals may also acquire by prescription, against the Crown or State, the right to the soil of public waters. *Idem* Sec. 37.

"When the shores or flats of tide waters have become private property the title thereto may be lost by disseisin. *Idem.*

The same doctrine is laid down in the following text books and reported cases: Black's Pomeroy on Water Rights, Secs. 21, 238; Woolrych on Waters, p. 440; Hale Deportibus Maris, Chap. 4; *Mayor of Mobile v. Eslava*, 33 Am. Dec. 329; *Robers v. Jones*, 1 Wend. 237, 19 Am. Dec. 493; *Gouch v. Bell*, 21 N. J. L. 165, 22 N. J. L. 44; *People v. Perry Co.*, 68 N. Y. 71; *Langdon v. New York*, 93 N. Y. 144; *Eisenbach v. Hatfield*, 12 Lawyer's Rep. Ann. 630; *Hess v. Miner*, 65 Md. 601, 5 Cent. Rep. 585; *Ward v. Ellis*, 6 Jones Law (N. C.) 183, 72 Am. Dec. 570; *Pike v. Monroe*, 36 Me. 309, 58 Am. Dec. 753; *Wrights v. Seymour*, 69 Cal. 122; *Church v. Meekin*, 34 Conn. 421a; *Peck v. Lockwood*, 5 Day, 26; *Parker v. Taylor*, 7 Or. 436; *Cadmody v. Rowe*, 6 C. B. 879; *Boston v. Lecran*, 56 U. S. 426; *Webb v. Demopolis*, 21 L. R. A. 62; *Abbott v. Treat*, 78 Me. 121; *Clement v. Burns*, 43 N. H. 609.

A grant of land bounded by high water "including all the shore to low water mark" will pass title to the shore. *Dillingham v. Roberts*, 75 Me. 469.

From a review of the above decisions we are satisfied that Kamehameha V had power to make a grant of land between high and low water mark. While it is claimed that Kamehameha V was a constitutional monarch it seems that he was little embarrassed by constitutional restrictions. By his own authority he abrogated the constitution of the kingdom that was adopted by Kamehameha III in 1852 and promulgated a new one to his own liking August 24, 1864. Such a monarch certainly possessed the usual powers of sovereignty conceded to constitutional rulers and had the right to convey the land between high and low water mark to the defendants' grantor.

The Attorney-General contends however that even if the general rule of law be as above stated, that at the time the deed in

question was made (1859) the king was not authorized under the law to award title to land below high water mark, because of a resolution of the king's privy council passed August 29, 1850, and if the deed or royal patents be construed to pass, by its terms, land between high and low water mark the king and his premier exceeded their powers and that so much of the deed as purports to convey the title to such land is null and void.

To sustain this contention the Attorney-General quotes the resolution of the privy council of August 29th, 1850, which reads as follows:

"Resolved, that the rights of the king as sovereign extend from high water mark a marine league to sea, and to all navigable straits and passages among the Islands, and no private right can be sustained, except private rights of fishing and of cutting stone from the rocks, as provided and reserved by law." 3 Privy Council Record, p. 425.

The Attorney-General argues that as this resolution was ten years prior to the Act of 1860 "for the relief of certain konohikis" who were entitled to lands under the great mahele of 1848 but who had failed to obtain their awards from the Land Commission, and who, by that Act, were given further time to procure their awards, therefore an award granted subsequent to the passage of the resolution of the privy council was subject to said resolution and void in so far as it attempted to pass title to land mentioned in the resolution.

This contention is without merit for two reasons, the first one being that the privy council had no power to enact laws. The only power they had at the time of the passage of this resolution was to advise with the king.

The powers of the privy council are provided for in the old Civil Code and are as follows:

"It shall be the duty of every privy councillor: (1) to advise the king according to the best of his knowledge and discretion. (2) To advise for the king's honor and the good of the public without partiality through friendship, love, reward, fear or favor. (3) Finally to avoid corruption and to observe, keep and

·do all that a good and true councillor ought to observe, keep and to do his sovereign." Civil Code, Sec. 26.

The legislative power was in the house of nobles and house of representatives, and only by their combined action and assent could laws be passed. We find no power given by any statute empowering the privy council to enact laws.

But even if it be conceded that the privy council possesses such power and that the "Resolution" quoted had the effect of a law, we are of the opinion that it would not affect the award and patent in this case, as they relate back to and are determined by the great mahele of 1848, in pursuance of which they were issued.

The award and patent in question were issued under the Act of 1860 for the relief of certain konohikis, section I of the Act being: "The Minister of the Interior is hereby authorized to grant awards for their lands to all konohikis who have failed to receive the same from the land commission, provided that the names of such konohikis appear in the mahele book of the year 1848; and all awards so granted by said minister shall be equally valid with those of the land commission."

The case *In re Boundaries of Pulehunui,* 4 Haw. 239, held that an award of the land commission of land "by name" is intended to assign whatever was included in such land according to the boundaries as known and used from ancient times. The opinion in that case, written by Mr. Justice McCully, describes practically how the boundaries of awards designated by name are arrived at.

"After the surrender by Kamehameha III, in 1848, of the greater part of the land of the kingdom to his chiefs and people, the necessity of a speedy distribution of it in accordance with what may be called the feudal rights of the chiefs, required that awards of lands be made by name only without survey. No body of surveyors could have been found in the country or practically could have been brought here, who might have surveyed these large estates within the lifetime of half the grantees, so that every award should have been issued as of a tract defined by metes and bounds, or with even an approximate statement of the

acreage. The "mahele" or division was, therefore, made without survey. Tracts of land known to Hawaiians as an ahupuaa or ili were awarded to those entitled by name of the ahupuaa or ili. By such grant was intended to be assigned whatever was included in such tract according to its boundaries as known and used from ancient times.

"With the Hawaiians, from prehistoric times, every portion of the land constituting these islands was included in some division larger or smaller, which had a name, and of which the boundaries were known to the people living thereon or in the neighborhood. Some persons were specially taught and made the repositories of this knowledge, and it was carefully delivered from father to son.

"The division of the lands were to a great extent made on rational lines, following a ridge, the bottom of a ravine or depression, but they were often without these and sometimes in disregard of them. Sometimes a stone or rock known to the aboriginals and notable from some tradition, or sacred uses, marks a corner or determines a line. The line of growth of a certain kind of tree, herb or grass, the habitat of a certain kind of bird, sometimes made a division. Through some parts of the country which must always have been unfrequented by the general population, as thick forests, rough and barren mountain lands, their division lines lay, where they could be traced out by some persons at least in charge of the territory, whose business it was to know them."

"A principle very largely obtaining in these divisions of territory was that a land should run from the sea to the mountain, thus affording to the chief and his people a fishery residence at the warm seaside, together with the products of the high lands, such as fuel, canoe timber, mountain birds, and the right of way to the same, and all the varied products of the intermediate land as might be suitable to the soil and climate of the different altitudes from sea soil to mountainside or top. But this mode of allotment had numerous exceptions, because some of the lands were for some reason not always understood, and perhaps arbitrary in the beginning, very wide at the top, cutting off a great number of other lands from the mountain; others in like manner wide in the low lands, cut off land from the sea.

"The contour of lands which have been surveyed and plotted is most irregular. The only general description would be that the lines are not rectilinear, and that there is no preference for

right angles. In size ahupuaas are found of form a hundred acres up to thousands, in several instances containing more than one hundred thousand and more than two hundred thousand acres.

"The statute which establishes the office of commissioner of boundaries prescribes that the holders of lands granted by name only shall apply to such commissioner for the settlement and determination of the boundaries of what is claimed, presenting a general description of them by "survey or otherwise." After notice to owners of adjacent lands, the commissioner sits to hear evidence of what are the ancient lines of the land in question, hearing what is offered by the petitioner and adversely to him by others whose interests are affected. He may aid his information by going on the ground, and is to endeavor to obtain all information possible to enable him to arrive at a just decision. An appeal lies to the Supreme or Circuit Court, on record of the evidence of witnesses before the commissioner, which may be supplemented by further testimony." 4 Haw. pp. 241, 242.

From this it will be seen that the great mahele of 1848 was a grant by name of certain tracts of land the boundaries of which were well known but not "defined by authority," and therefore it became necessary to provide for the settlement of the boundaries, in pursuance of which an Act was passed, in 1862, "To provide for the appointment of boundary commissioners."

By this Act, before a royal patent could issue on a land, a commission award of the boundaries of the land had to be ascertained as provided in the Act, and by Section 10 of the Act, the Minister of the Interior was forbidden to issue any patent on an award until the boundaries had been so ascertained.

The title of the owner in the lands passed by the mahele, although the award was not issued till long afterwards, it being necessary to reduce to a survey the boundaries of the grant, which boundaries were determined as of the time of the mahele, and the award and patent in this case therefore related back to 1848, two years before the resolution of the privy council was passed, and therefore were not affected by the resolution, even conceding it to have been valid.

The Attorney-General further contends that as the royal patent and award contained the words "koe nae ke kuleana o na kanaka" this reserved to the people all the rights below high water mark not expressly recognized as private rights, and that this reserved all rights excepting the rights to fish and the rights to remove coral rock. He states that the king was "authorized by the law and by the land commission award to issue the royal patent reserving however the people's kuleana therein. The people's kuleana was the land between high water mark and low water mark, which Kamehameha had no authority to alienate."

By reference to the statutes of 1845-46, Vol. 2, pp. 81, 94, it will be seen that the grants are to be made "subject to the private rights of the tenants, if there be any on the land," and on page 85 in a definite statement of the public rights to which the grant is subject, showing that the words "koe nae ke kuleana o na kanaka", have no reference to such public rights, but can only have reference to the house lots and taro patches and gardens of tenants living on land within the boundaries of the larger tract granted.

We are of the opinion that the words quoted have a well understood meaning as used in conveyances within this Territory and that they, as well as the English equivalent "reserving however the people's kuleana therein," mean the reservations of the house lots and taro patches or gardens of natives lying within the boundaries of the tract granted.

The order overruling the demurrer of defendants is reversed, and the cause remanded with directions to the trial court to sustain the demurrer and order the bill dismissed.

*E. P. Dole*, Attorney-General, for the Territory.

*Robertson & Wilder* for the defendants.

*Hatch & Silliman* as *amicus curiae* on behalf of defendants.

CONCURRING OPINION OF THOMAS FITCH, Esq.

I concur in the decision of the Court reversing the *pro forma* order of the First Judge of the First Circuit Court overruling a

demurrer to a bill for an injunction filed by the Attorney-General of Hawaii, in behalf of the Territory of Hawaii.

It is alleged in the bill that the title to all lands on the shores of the Territory between high water mark and low water mark, is in the United States Government, as the sovereign power, subject to certain private rights of fishing, and cutting stone from rocks, and that the Territory of Hawaii is entitled to the possession, control, management, use, income and benefit of said lands except certain portions reserved by executive orders of the President. The bill sets forth that the defendant Wilson, under a pretended authorization of the defendant ex-Queen Liliuokalani, is taking sand and gravel for commercial purposes from certain lands at Waikiki below high water mark, and will continue to do so unless restrained by injunction. The bill further alleges that the beach where said lands are, is a general bathing resort; that the tide lands are of immense value to the Territory for the health, recreation and pleasure of its citizens, and of tourists and others: that the carrying away of sand is greatly injuring and threatens to destroy the beach at Waikiki, and to render the land between high and low tide unfit for bathers, by reason of coral, and will thus work irreparable injury to the rights and interests of the Territory.

The bill sets out fully not only the alleged title of the Territory but the title of the defendant—ex-Queen Liliuokalani—acquired by conveyance from the patentee; it recites in extenso the Hawaiian Act of August 14th, 1860, for the relief of certain konohikis; it contains by stipulation the royal patent issued on the 23d of March, 1866, to the grantor of defendant, and appends thereto a translation thereof into English, and anticipating the objection that the royal patent which contains a description by metes and bounds, includes the land to low water mark along the sea-shore, the Attorney-General declares that the king had no lawful power or authority to convey the land below high water mark.

The habendum clause in the patent reads "To have and to hold the above granted land in fee simple unto the said A. Keo-

hoalole and his heirs and assigns, etc." The words "Koe nae ke
kuleane o no kanaka" usually translated as "reserving however
the rights of the people" contained in the Hawaiian version of
the patent, are not included in the English translation, but, such
omission evidently having been inadvertant, they will be con-
sidered as though they had been therein.

In my opinion the words "people's rights" as used in the pat-
ent, had reference to the house lots and taro patches of native
tenants, and the word "reservation" had reference to their right
to claim small tracts within the boundaries of larger ones (see
Principles Adopted by the Board of Commissioners to Quiet
Land Titles, Vol. II Statute Laws, page 73). The Attorney-
General contends that among the "rights of the people" that
were "reserved", was a right to use the tide lands for bathing
purposes. He claims that the defendants by taking sand from
the beach in front of their own premises, impaired the value not
only of that beach, but of the beach in front of adjacent lands for
bathing purposes. There is no allegation in the bill that the
Territory owns any tide land adjoining that of the ex-Queen,.
and therefore the Attorney-General's claim of a right to inter-
fere, rests solely upon the assumed duty of the Territory to pro-
tect an alleged public bathing privilege.

Without passing upon the right of a person who has gained a.
lawful entrance upon the beach below high water mark, to
travel along the same, over the tide lands of any riparian owner,
or littoral owner by grant of the same, or even to bathe upon the
same, I doubt whether such a right, if it exist, extends so far that
it can be used by the bather as a basis for an injunction restrain-
ing the riparian owner, or owner by grant from removing the
soil for commercial purposes, even if such removal should result
in denuding the coral rocks of their covering of sand, so as to
make wading in the water less pleasant to the bather.

In no usage, decree, constitution or law of the kingdom of
Hawaii can be found any mention of such a thing as a right or
privilege of bathing. The land commission in its declaration of

7–D

principles governing its methods and its awards, which were en-
acted as and given the force of law, set out the prerogatives of
the government and the rights of the public which were not in-
tended to pass by its awards (Statute Laws, Vol. II, pages 81-94).
. These, briefly stated, were "to forfeit for treason; to levy
taxes; to encourage and even enforce the usufruct of the land
for the common good; to provide roads and the like; to have the
power of eminent domain." (Page 85, authority last cited.)

"To encourage and even enforce the usufruct of the land for
the common good", was undoubtedly intended to cover the right
of private persons and corporations to condemn land for quasi
public purposes, and also the inalienable right, not only to con-
duct commerce over navigable waters, but to provide wharves
and landing places for its accommodation.

, It is inconceivable that even the primitive government in ex-
istence during the earlier period of Hawaiian nationality should
have so legislated as to compel ships to anchor and unload their
cargoes from lighters, lest the construction of wharves should
lessen the comfort and convenience of bathers. No authority
upholding such an assumed superior right of the public to bathe
has been called to my attention and the only case I have been
able to find on the subject holds against such a contention.
*Blundell v. Catherall*, 5 Bam. & Ald. 268.

In that case Baily, Judge, after finding that there has never
been such right under English law, goes on to say that the right
claimed if it exists at all must exist upon every part of the sea-
shore. "Every private building then erected upon the seashore
and even wharves and quays would be an obstruction to that
right and in consequence abatable. Every embankment by
which land is redeemed from the sea would obstruct the exercise
of this right and be a nuisance, and so would be the erection of
stakes for holding nets, and yet how frequently such embank-
ments are made and such stakes set up." The judge concluded
by observing that the inconvenience which would result from
such a right afforded to his mind a strong argument against its
existence (5 Bam. & Old. 304).

Abbott, Chief Justice, observes in a separate opinion that "in some parts of the coast where the ground is nearly level and the tide ebbs to a great distance embankments have been built, and thousands of acres gained from the sea for pastures and tillage." And he asks how such improvements could have been made without a destruction or infringement of this supposed right if it did exist? (Bam. & Ald. 310.)

It seems to me that this reasoning is entirely satisfactory, and that if the right of bathing, claimed by the Attorney-General, exists at all, it is subordinate to any other lawful use that the riparian owner, or owner by grant, may desire to make of the soil.

The decision of the First Judge of the First Circuit overruling the demurrer might be reversed solely upon the ground that while the right of navigation and the right of free fishery are public rights whose threatened invasion might be prevented by injunction, yet the privilege of using the tide lands for the purpose of bathing is not a public right which equity would enforce.

But in the case at bar, the Attorney-General places the claim of the Territory to an injunction not merely upon an alleged interference with the bathing rights of the public, but upon the broad ground that it was never in the power of the king to convey land below high water mark, and the question of the power of the king with respect to the disposition of the public lands is therefore the main subject for consideration.

Prior to the Bill of Rights promulgated in 1839 in the reign of Kamehameha III, the power of the king was restrained by usage only. Kamehameha I, by right of conquest became lord paramount of these islands. He was an absolute monarch. His will was law. He was the lord of life and death. He was unrestrained by any constitution. He was the owner of all the land in the kingdom, whether under the sea or above it. Kamehameha III, as his successor possessed technically the same absolute power and the same ownership of the soil. But by 1840 the influence of the early missionaries coupled with American and English enterprise, had developed the inhabitants of these

islands from a barbarous into a semi-civilized people. With the exception of the people of Japan no Asiatic or Malayese race ever exhibited such capacity for rapid assimilation and adoption of western civilization as the Hawaiians. In 1840 the first constitution was adopted. All of the law, prior to Volumes I and II of the statute laws, was gathered into a little volume by Rev. William Richards entitled "The Constitution and Laws of 1840." It contains translations of the various acts, promulgations and declarations of the constituted authorities down to the year 1842.

There were no allodial titles here under the ancient system, and feudal holdings, not unlike those of Europe, save the military features, alone existed. The right of possession of the larger tracts of land passed with the gift of the sea frontage which was of the greater value because of the right to take fish. On page 26 of the Rev. William Richards' little compilation will be found the last feudal declaration of the king. He declares that he takes the fishing grounds from those who now possess them, from Hawaii to Kauai, and gives one portion to the common people, another to the landlords, and a third he reserves to himself. After giving certain grounds by name to the people, by which word is meant the common people or tenants, he declares, "But the fishing grounds from the coral reef to the seabeach are for the landlords and for the tenants of their several lands and not for others. But this exclusive right does not extend into the deep sea beyond the coral reef." (Page 29, Richard's Volume.)

It appears from these authorities that in the earliest days exclusive individual rights in the non-navigable waters were given and recognized by the sovereign. These exclusive rights however, did not extend beyond the coral reefs which are the natural barriers of commerce where reefs exist.

Volumes I and II of the statute laws of Hawaii are a compilation and a code. They are of a wholly different character from the group of promulgations published in the constitution and laws of 1840. They are based on English ideas and were evi-

dently written by men who were more or less familiar with American law.

We may draw enlightenment on most subjects from the decisions of English and American courts, but there is little occasion to resort elsewhere than to the written and unwritten laws of the Hawaiian kingdom in order to ascertain the rights of the king either individually or in his representative capacity to the lands between high and low water mark. We cannot look to the civil law for precedent, for these islands were never owned, claimed or colonized by any Latin power or people. Neither can we depend altogether upon the common law of England, for, although largely controlled by American influence, Hawaii was never either an English or an American colony, and even if it had been, it could not be assumed in the absence of statutory adoption that the common law of England as it existed in 1776 ever came here and abided here unchanged, for the common law of England is less a system than a growth. It is not a collection of fixed rules but an adaptation of elementary principles to changing conditions, and it draws its maxims alike from the pandects of Justinian and the edicts of Saxon kings. Yet in many particulars the political and social history of Hawaii resembles that of Great Britain. The English people were centuries in passing from the iron collars of Cedric to the pledge of Magna Charter, while Hawaii made the transit in half a century.

Even under the common law of England the crown never possessed a title to the tide lands that it was not able to alienate. Those lands were subject to the right of all persons to use the waters flowing over the same for the purposes of navigation and fishery, unless restrained by law; but the bed or soil belonged to the crown, and could be alienated by the crown, and in very many instances the tide lands belonged and to this day belong by grant or by immemorial usage, or by virtue of riparian rights, to the lord of the manor fronting on the sea.

In Meyer's Federal Decisions, Sec. 37, Vol. 23, it is said: "The soil on which the tide ebbs and flows may be parcel of a manor. When the sea flows admiralty has jurisdiction but when

the sea ebbs the land may belong to a subject, and everything done on the land when the sea is ebbed shall be tried by common law, for it is then parcel of the country and *infra corpus comitatus.*"

The exclusive right of taking fish as far out as the coral reef extends, or, where there are no reefs, then for a distance of one geographical mile from low water mark, is recognized and confirmed by Hawaiian law in the landlords "whose lands by ancient recognition belong to the same." It will be observed that with the ancient Hawaiian, the idea prevailed in marked contrast with our own traditions, that the land belonged to the fishery, not that the fishery was incident to ownership of the land (Vol. 1, page 90, Laws of Hawaii).

In support of the grounds assigned by the Territory for asking an injunction in this case, the Attorney-General claims:

1st. That by the constitution of 1840 it was declared that Kamehameha I. held all the lands in the islands but not as his private property; that the lands belonged to the chiefs and people in common, of whom Kamehameha I. was head.

2d. That the great mahele of 1848, which divided the lands between the king, chiefs and people, did not alter the character of the lands; that they remained crown lands, or public lands, and that no grantee could obtain a title to any other or greater rights than the grantor possessed.

3d. That the privy council on August 29, 1850, passed a resolution declaring "that the rights of the king as sovereign extend from high water mark a marine league to sea, and no private right can be sustained except private rights of fishing and of cutting stone from the roads as provided for and reserved by law."

4th. That by virtue of the privy council resolution of August 29, 1850, the king and his premier were divested of any authority to convey a title to lands between high water mark and low water mark; and so much of the deed of the king and premier made in 1856 to appellant's grantors as purports to convey such lands is null and void.

In order to dispose of this contention of the respondent, it is not necessary to inquire whether the exposition, contained in the constitution of 1840, of the principles on which the dynasty of the Kamehamehas was founded, deprived the reigning king of that individual ownership of all lands which Kamehameha I. obtained by right of conquest. In the great mahele of 1848 the absolute title in fee of the king as an individual, in one-third of all the lands, was conceded and granted. But admitting for the purposes of argument that from the inception of the kingdom all the lands belonged to all the people, it yet does not appear that the law debarred the people from granting through the king, to private individuals the public lands between high water and low water mark. The restriction on the granting power attempted to be made by the privy council resolution of August 29, 1850, was no restriction at all, because the constitution of 1840 expressly provides that no law shall be passed without the assent of a majority of both the house of nobles and the house of representatives. The privy council was a body with executive not legislative functions (Civil Code 26) and there are many reasons why the resolution of 1850 found in Vol. 3, Records of the Privy Council, page 425, ought not to be accepted as a full statement of private and public rights in the waters surrounding these islands, the most obvious of which is, perhaps, that it has no reference to the great subject of commerce and commercial needs. The resolutions of the privy council were not required by law to be kept among the public archives. The public did not contract with a view to privy council resolutions, nor was any one required to take notice of them. The proceedings of the privy council were always kept more or less secret, and any privy council resolution ought to receive very little recognition as a declaration of public and general custom.

Western civilization is now rapidly extending its spheres of influence in the eastern hemisphere. A commerce of incalculable extent and value is being developed between the lands whose shores are washed by the vast eliptic of seas which extend from Valparaiso to Vladivostok, from Alaska to New Zealand.

Hawaii is almost the centre where the currents of commerce must meet. Maritime cities will necessarily be developed here. Are piers, and wharves, and dry docks to remain unbuilt, and is progress to be checked if not destroyed by a fishing resolution of the advisers of Kamehameha passed fifty years ago?

As the privy council resolution of 1850 was not law, not having received the approval of a majority of either the house of nobles or the house of delegates, it could not limit or extend the rights of the king, either as an individual or as a monarch, over tide lands.

If the power of the crown to alienate tide lands in favor of private individuals existed in the crown by the analogies of the common law of England, and by ancient Hawaiian law, traditions, and practices, and was not (because under the constitution it could not be) taken away by the privy council resolution of 1850, then how and when and where did the crown lose it?

On page 107 of Vol. 1. of the Laws of Hawaii will be found the law creating the commission to quiet land titles. It was this commission that, with the exception of a few awards made to chiefs by the Minister of the Interior, under the Act of August 24, 1860, for the relief of certain konohikis, settled and established the inception of private land titles in this Territory. It was authorized to ascertain and establish the titles of private individuals to all the landed property in the kingdom. It was organized in the year 1846 and continued its work under general authority until the year 1854, after which time it heard and awarded by special authorization certain claims of konohikis or chiefs.

This commission was a court with jurisdiction to hear and dispose of all claims to private lands. Royal patents were issued upon these awards, but were of a ministerial character and neither conveyed nor confirmed title (*Bruns v. Minister of Interior*, 3 Haw. 787).

An Act of June 19th, 1852, provided that the board might grant large tracts by name without survey, and the Act of

August 23d, 1862, provided for the appointment of a boundary commission which was empowered to take evidence, survey the lands and fix the boundaries, and the Minister of the Interior was expressly prohibited from issuing any patent in confirmation of an award until the boundaries were so ascertained.

This court, in the matter of the boundaries of Pulehunui (4 Haw. 239) considering and construing this act, held that in granting these large tracts it was intended to include whatever was included in the tract according to its boundaries as known and used from ancient times. From prehistoric times every portion of the lands constituting these islands were included in some division, large or small, which had a name, and of which the boundaries were known to the people living thereon or in the neighborhood. These, the land commission awarded, and, in the case of large tracts the boundary commissioner defined. Both were judicial determinations, and were the only legal mode of confirming and fixing boundaries, and, when pursued were binding upon the whole world. The grant in this case was made specifically to low water mark, but if it had been made to "navigable waters" it would in my opinion have conveyed the tide lands between high water and low water mark.

This court has held that the title to the soil beneath navigable waters is in the state and is inalienable (*King v. Oahu Railway and Land Company*, 11 Haw. 717-725). But this court did not in that decision, or in any other, define navigable waters as waters flowing over tide lands; nor would such a definition be in harmony with the conditions existing on these shores or with the weight of American authority. The semi-diurnal or free tide wave produced by the action of sun and moon, ebbs and flows in about twelve hours and twenty-four minutes. In high northern latitudes land which is bare at low tide may be covered at high tide with sufficient water to float a line of battle ship, while on the shores of Hawaii, the tide lands are, even when the sun and moon are in conjunction and the time is near the equinoxes, rarely covered with sufficient water to float a fishing boat.

The reasonable definition of the term "navigable waters" is

that only waters which are navigable in fact are "navigable waters." Such was the rule in the earliest English cases and many titles have been recognized by the English courts as valid which included tide lands adjoining ancient manors. Later a dicta, many times repeated, stated that by the common law all waters, where the tide ebbed and flowed were navigable and public or royal waters.

But the courts in the United States, while occasionally repeating this dicta, have almost uniformly denied its application to our situation, have refused to adopt is at a test, and have declared that it was only adapted to the rivers and estuaries of Great Britain. So that the rule has come to be recognized everywhere, save in New England, that only those waters are navigable in law which are navigable in fact (*Willow River Club v. Wade*, 42 L. R. A. 305).

Conceding that the soil under the navigable waters belong to the United States as the successor in sovereignty of the Republic and the kingdom of Hawaii, to whom does the soil lying between the shore and the line that divides the navigable and non-navigable waters belong? How is the line dividing the navigable from the non-navigable waters to be determined?

There have been two lines of reasoning employed to define the non-alienable rights of the public and those of riparian owners. Some courts have held, the Supreme Court of Wisconsin for instance, that the adjoining riparian owners have the title to the soil, subject to the public easement of navigation; others, the Supreme Court of Minnesota for instance, that the title to the soil remains in the state until the land is filled in and reclaimed. But these latter courts also hold that the riparian owner has a right to fill in, to remove the soil, to convey, and to use the land, provided he does not interfere with the dominant right of public navigation (*Willow River Club v. Wade, supra; Bradshaw v. Duluth Imp. Mill Co.*, 52 Minn. 59; *Gilbert v. Emerson*, 55 Minn. 254-260; *Miller v. Mendenhall*, 43 Minn. 95; *Yates v. Milwaukee*, 10 Wall, 497).

The Supreme Court of the United States in those matters follows the decision of the local or state courts. (*Kankana Water Power Co. v. Green Bay Corral Co.*, 142 U. S. 254; *Parker v. Bird*, 137 U. S. 661; *Hardin v. Jordan*, 140 U. S. 371-382.)

In view of the decision of this court in *King v. Oahu Railway and Land Co.* I am of opinion that the result reached by both lines of reasoning is best expressed by holding that the soil under waters navigable in fact belongs to the United States, and that the soil between the shore and the line dividing the navigable from the non-navigable waters is in the riparian owner, or owner by grant.

How is the line defining the navigable from the non-navigable waters to be determined?

The Constitution of the United States gives Congress the control of commerce, and Congress has authorized the Secretary of War to establish harbor lines (1 Eupp. Rev. Stat. U. S. 802; Gould & Tucker, Notes, 608-614).

Where lines have been established by the Secretary of War they are conclusive. Where no lines have been established the riparian owner's right to reclaim extends to the line of practical navigation. The line of practical navigability has been well defined by the United States Court of Appeals of the Seventh Circuit in the case of *Illinois v. Illinois Railway Co.*, 91 Fed. 955. The circuit court there said:

"The extent of this riparian right" (to build wharves and dredge slips) "is a relative question. A pier that might have met the conditions of commerce fifty years ago would be wholly inadequate at the present time   *   *   *   Regard must be had to the object for which the right is conferred. It is to reach out to accommodate the vessels that plow the waters of the lake. It is in aid of the commerce of the lake, and that right for that purpose should be liberally interpreted and upheld."

I am therefor of opinion that in this Territory, in the absence of established lines, the right extends far enough out to accommodate deep sea-going ships.

The bill of the Attorney-General shows that in this instance

there was an award and grant including the land between high and low water mark. In England and America the right of the state to convey tide lands has been frequently recognized and upheld (*Waverly Water Front Co. v. White*, 45 L. R. A. 227; *Sale v. Pratt*, 19 Pick, 197; *Church v. Meeker*, 34 Conn. 427; *Nudd v. Hubbs*, 17 N. H. 526).

This Court is required by the decisions of the Supreme Court of the United States to recognize all vested rights, including those to the soil under public navigable waters, if any exist. (*Knight v. U. S. Land Association*, 142 U. S. 182; *San Francisco v. Leroy*, 138 U. S. 666.)

The Attorney-General in his argument insisted that the propositions I have attempted to discuss are inapplicable because there was no power in Kamehameha to make the grant to the grantee named in the patent. It is an all sufficient answer to say that the grant was an award duly made, upon which the patent issued, presumably after the boundaries of the ancient right had been ascertained by a boundary commission. And in the absence of anything to the contrary the law will presume that to have been done which the law required to be done.